24CA0282 Peo in Interest of JC 12-26-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0282
City and County of Denver Juvenile Court No. 22JV30734
Honorable Laurie A. Clark, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of J.C. III and T.C., Children,

and Concerning J.A.C. II,

Appellant.

---

JUDGMENT AFFIRMED

Division A
Opinion by CHIEF JUDGE ROMÁN
Bernard* and Richman*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 26, 2024

---

Kerry Tipper, City Attorney, Christina R. Kinsella, Assistant City Attorney, Denver, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

John F. Poor, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1    J.A.C. II (father) appeals the judgment terminating his parent-child legal relationships with his children, J.C. III and T.C. We affirm.

## I.    Background

¶ 2    In November 2022, law enforcement officers performed a welfare check on father's mobile home and discovered the children locked in a bathroom. The children had untreated second-degree burns and tested positive for methamphetamine and fentanyl. Based on this information, the Denver Department of Human Services (Department) removed the children, placed them with foster parents, and filed a petition in dependency and neglect.

¶ 3    In January 2023, father admitted that the children were in an injurious environment, and the juvenile court adjudicated the children dependent and neglected. A month later, the court adopted a treatment plan for father that required him to address his substance abuse issues, meet the children's needs, communicate with the Department, and attend family time with the children.

¶ 4    In December 2023, the Department moved to terminate father's parental rights. The juvenile court held an evidentiary hearing in January 2024. After hearing the evidence, the court

granted the Department's motion and terminated the parent-child legal relationships between father and the children.

## II.    Uniform Child-custody Jurisdiction and Enforcement Act

¶ 5    Father first asserts that the juvenile court erred by determining that it had jurisdiction under the Uniform Child-custody Jurisdiction and Enforcement Act (UCCJEA).  We agree with the juvenile court that it had jurisdiction under the UCCJEA.

### A.    Applicable Law and Standard of Review

¶ 6    The UCCJEA aims to avoid jurisdictional competition in child-custody matters.  *Brandt v. Brandt,* 2012 CO 3, ¶ 19; *see also People in Interest of S.A.G.,* 2021 CO 38, ¶ 23 (noting that every state has adopted the UCCJEA except for Massachusetts).  To effectuate this purpose, it establishes a comprehensive framework to determine whether a court may exercise jurisdiction in a child-custody matter or whether it must defer to a court of another state.  *People in Interest of A.B-A.,* 2019 COA 125, ¶ 9.

¶ 7    The UCCJEA prescribes two ways for a Colorado court to issue an initial child-custody determination: temporary emergency jurisdiction, § 14-13-204, C.R.S. 2024, and non-emergency

jurisdiction, § 14-13-201, C.R.S. 2024.  Because it is undisputed that the juvenile court could not terminate the parents' parental rights under the temporary emergency jurisdiction provision of the UCCJEA, our analysis focuses only on non-emergency jurisdiction. *S.A.G.,* ¶ 35 ("[S]ection 14-13-204(2)'s reference to final determinations does not permit courts to terminate parental rights pursuant to temporary emergency jurisdiction in the absence of a continuing abandonment or emergency.").

¶ 8    A court may exercise non-emergency jurisdiction in one of four ways: (1) home-state jurisdiction; (2) significant-connection jurisdiction; (3) more-appropriate-forum jurisdiction; and (4) last-resort jurisdiction.  *See* § 14-13-201(1); *S.A.G.,* ¶ 26.  Because the UCCJEA prioritizes home-state jurisdiction, a Colorado court must first determine whether it or another state has home-state jurisdiction before it considers any of the other forms of jurisdiction.  § 14-13-201(1)(a); *see People in Interest of C.L.T.*, 2017 COA 119, ¶ 26; *see also Madrone v. Madrone*, 2012 CO 70, ¶ 11.

¶ 9    Under the UCCJEA, a Colorado court has home-state jurisdiction if Colorado was "the home state of the child on the date of the commencement of the proceeding."  § 14-13-201(1)(a).  As

relevant here, "home state" is defined as "the state in which a child lived with a parent . . . for at least one hundred eighty-two consecutive days immediately before the commencement of a child-custody proceeding." § 14-13-102(7)(a), C.R.S. 2024. "Commencement" refers to "the filing of the first pleading in a proceeding." § 14-13-102(5).

¶ 10    Whether a juvenile court has jurisdiction over a child-custody proceeding under the UCCJEA presents a question of law that we review de novo. *Brandt*, ¶ 18. But any factual dispute upon which the existence of jurisdiction may turn is for the juvenile court to resolve, and an appellate court may not disturb the juvenile court's factual findings unless they are clearly erroneous. *S.A.G.*, ¶ 21.

## B.    Analysis

¶ 11    Father maintains that the record does not definitively establish that Colorado was the children's home state and therefore the juvenile court erred by exercising home-state jurisdiction under the UCCJEA. We are not persuaded.

¶ 12    In its petition, the Department noted that the "family report[ed] being from Upstate New York," but mother told the Department that the family had come to Colorado "just over a year"

before the filing of the petition. However, at an advisement hearing a few weeks later, mother said that they had arrived in Colorado "around tax time." The court clarified that mother meant April and stated that "if they've been here since April, then that would put them here at six months." The court then asked mother whether she meant "April of this year," and mother responded, "Yeah. It was after Easter."

¶ 13    At the adjudicatory hearing in January 2023, father's counsel stated on the record that the family had "been in Colorado for over a year" and that father "consider[ed] Colorado to be their residence . . . or home state." Based on this information, the juvenile court found that it could exercise home-state jurisdiction under the UCCJEA. In ruling on the termination motion, the court again found it could exercise home-state jurisdiction, noting that the children had lived with a parent in Colorado for more than 182 consecutive days before the commencement of the proceeding.

¶ 14    Notwithstanding his own concession that the family had lived in Colorado since at least January 2022, father now asserts that, based on mother's statements at the November 2022 hearing, the record is unclear whether the family had been in Colorado for more

5

than 182 days when the Department filed its case. The Department and the guardian ad litem contend that other evidence in the record, including the parents' criminal histories, shows that they had been in Colorado for several years.

¶ 15     However, we need not decide whether the record shows that the family had been in Colorado for several years because mother's statements support the court's determination that the children had lived with a parent in Colorado for more than 182 consecutive days immediately before the commencement of this case. *See* § 14-13-102(7)(a). Therefore, Colorado was the children's home state, and the juvenile court properly exercised home-state jurisdiction. *See* § 14-13-201(1)(a).

¶ 16     We are not convinced by father's attempt to suggest that mother's statement may have placed the family's arrival sometime later in the spring of 2022. To be sure, the juvenile court did mention "spring" in its conversation with mother. But mother never suggested that the family arrived any later than April. Indeed, mother described two events that occurred in April and answered in the affirmative to whether the family arrived "around April of this year." Therefore, even if the family arrived in Colorado on the last

day of April 2022, they had still lived in Colorado for more than 182 consecutive days.

¶ 17     In sum, because there is nothing in the record to indicate that the family had arrived in Colorado any later than April 2022, we discern no error in the juvenile court's determination that it had non-emergency jurisdiction under the UCCJEA.

### III.    Less Drastic Alternative

¶ 18     Father next contends that the juvenile court erred by finding that there was no less drastic alternative to termination.  We disagree.

### A.    Applicable Law and Standard of Review

¶ 19     The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent and neglected; (2) the parent has not complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change in a reasonable time. § 19-3-604(1)(c), C.R.S. 2024.  The party moving for termination has the burden to prove the statutory criteria by clear and

convincing evidence.  *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 8.

¶ 20    In addition to the termination criteria in section 19-3-604(1)(c), the juvenile court must also consider and eliminate less drastic alternatives.  *People in Interest of M.M.*, 726 P.2d 1108, 1122-23 (Colo. 1986).  The consideration of a less drastic alternative is not a separate criterion but "is implicit in, and thus intertwined with, the statutory criteria for termination."  *People in Interest of L.M.*, 2018 COA 57M, ¶ 24.

¶ 21    When considering less drastic alternatives, a court must give primary consideration to the child's physical, mental, and emotional conditions and needs.  § 19-3-604(3); *People in Interest of Z.P.*, 167 P.3d 211, 214 (Colo. App. 2007).  In doing so, the court may consider, among other things, whether (1) an ongoing relationship between the parent and child would be beneficial, *People in Interest of A.R.*, 2012 COA 195M, ¶ 38; and (2) an allocation of parental responsibilities (APR) provides adequate permanence and stability for the child, *People in Interest of T.E.M.*, 124 P.3d 905, 910-11 (Colo. App. 2005).

¶ 22    To aid the juvenile court in determining whether there is a less drastic alternative to termination, the department must evaluate a reasonable number of people the parent identifies as placement options. *People in Interest of D.B-J.*, 89 P.3d 530, 532 (Colo. App. 2004). But the department is not obligated to "independently identify and evaluate other possible placement alternatives." *Z.P.*, 167 P.3d at 215; *see also People in Interest of M.T.*, 121 P.3d 309, 314 (Colo. App. 2005) ("[T]he department of social services is not responsible for ferreting out and investigating relatives who have not been identified as placement alternatives.").

¶ 23    For a less drastic alternative to be viable, it must do more than "adequate[ly]" meet a child's needs; rather, it must be the "best" option for the child. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 27. If the juvenile court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order termination. *Id.* at ¶ 32. And under those circumstances, we must affirm the court's decision if its findings are supported by the record. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

## B. Analysis

¶ 24 At the termination hearing, the caseworker testified that father did not comply with his treatment plan, he was unfit, and his conduct or condition was unlikely to change in a reasonable time. Specifically, the caseworker reported that father was incarcerated until June 2023 on charges related to the incident that began this case, but he was released following a plea agreement that required him to enter substance abuse treatment. However, the caseworker could not confirm whether father entered treatment because he did not communicate with her, except for a few text messages in August and September 2023. Father was arrested on a warrant in December 2023 for failure to comply with his probation sentence, and the criminal court resentenced him to another term of probation that again required him to enter a residential treatment program. Father entered the program but left after a few days. He did not have any contact with the children during the case.

¶ 25 The caseworker reported that the children had been placed in a foster home, and they were doing well in that home. The caseworker said that the Department also explored potential relative placement options but did not discover any appropriate

placements. For example, she stated that the Department contacted paternal relatives, but those relatives declined placement. The caseworker said that mother did not ask the Department to investigate any maternal relatives until shortly before the termination hearing. The caseworker contacted a maternal aunt, who said that she was "not in a position to take" the children; however, the maternal aunt provided contact information for a maternal cousin the day before the hearing. The caseworker said that she had received a call from maternal cousin during the hearing, but she had not "had a chance to have a very long conversation" with her.

¶ 26    Ultimately, the caseworker opined that there were no less drastic alternatives to termination based on the children's young ages, father's inability to comply with his treatment plan, and his lack of contact with the children. The caseworker further opined that the children needed permanency and stability that could only be achieved through adoption. Finally, the caseworker stated that, even if maternal cousin (or some other relative) was an available placement option, an APR would still not be in the children's best interests for the same reasons described above.

¶ 27 Based on this evidence, the juvenile court found that the Department had established the statutory criteria in section 19-3-604(1)(c) by clear and convincing evidence. The court also specifically considered and rejected less drastic alternatives to termination. In doing so, the court noted that (1) the Department had adequately explored possible alternatives and (2) although the cousin may still be a placement option post-termination, the evidence established that termination and adoption was in the child's best interests. *See, e.g.,* § 19-3-605(1) (noting a preference for relatives when considering post-termination placement). All in all, the court determined that it was in the children's best interests "to have the permanency that adoption can provide, particularly given [their] young age."

¶ 28 In sum, the record shows that the juvenile court properly considered less drastic alternatives but rejected them because they were not in the children's best interests. *See A.M.,* ¶ 32. And because the record supports the court's findings, we cannot disturb them. *See B.H.,* ¶ 80.

¶ 29    Nevertheless, father asserts, for the following two reasons, that the juvenile court committed reversible error when it terminated his parental rights.  We are not persuaded.

¶ 30    First, father argues that the juvenile court shifted the burden of proof to him by "declin[ing] to consider the potential role of kinship placements."  We disagree because the court's ruling properly recognized the difference between an available placement option and a viable less drastic alternative to termination by recognizing that, even if maternal cousin (or some other relative) was an appropriate placement option, an APR to her would still not be a viable less drastic alternative for the reasons described above.  In other words, the court did not necessarily need to consider whether the maternal cousin would be an appropriate placement option when a less drastic alternative — i.e., an APR to maternal cousin or anyone else — would not be in the children's best interests.  The record otherwise shows that the court held the Department to its burden to prove the statutory criteria in section 19-3-604(1)(c).  We therefore discern no error.

¶ 31    Second, father maintains that the juvenile court erred because the record did not establish that the Department performed

"adequate and ongoing searches for potential kinship placement options throughout the case." But for purpose of the court's less drastic alternatives analysis, the Department only has a duty to evaluate a reasonable number of people the parent identifies as placement options. *See D.B-J.*, 89 P.3d at 532. And the record supports the court's finding that the Department adequately investigated those parties timely identified as placement options. Although the Department's regulations may have required more, as father asserts, we are not guided by those regulations. What's more, the evidence supports the court's conclusion that, regardless of the placement option, a less drastic alternative, such as an APR, was not in the children's best interests. Thus, even if the Department needed to do more, we nevertheless discern no reversible error.

## IV. Disposition

¶ 32 The judgment is affirmed.

JUDGE BERNARD and JUDGE RICHMAN concur.

14